IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

RAJU CHILUVURI,                )
                               )
        Plaintiff,             )
                               )
v.                             )   Civil Action No. 1:24-cv-2051
                               )
                               )
NATIONAL SCIENCE FOUNDATION,   )
                               )
        Defendant.             )

### MEMORANDUM OPINION

This matter comes before the Court on Defendant National Science Foundation's ("NSF") Motion to Dismiss Plaintiff's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and Plaintiff's Motions for Leave to Supplement the Record and Motion for Leave to File a Sur-Reply.

Plaintiff Raju Chiluvuri ("Plaintiff") is a software engineer who has dedicated his professional life "to researching solutions to the software crisis after serendipitously discovering a new kind of software component essential for building software produced as Component-Based Products (CBPs)." Plaintiff holds eight patents related to the design and production of computer software "using a component-based approach for constructing software products as CBPs." Plaintiff further alleges that he has developed new fields of science known as "Componentology" and

1

"Neuronology" that are "transformative in nature" and "akin to Germ Theory or Heliocentrism."

The NSF is an independent federal agency within the Executive Branch of the United States Government. See 42 U.S.C. § 1861. It is authorized to "mak[e] contracts or other arrangements (including grants, loans, and other forms of assistance) to support [] scientific, engineering, and educational activities and to appraise the impact of such research upon industrial development and upon the general welfare[.]" Id. § 1862(a)(1).

As part of this authorization, NSF participates in the Small Business Innovation Research ("SBIR") program, which Congress created in 1982 to ensure small businesses could participate in these grant programs and obtain monetary assistance to conduct research into, and development of, "scientific and technical . . . ideas that appear to have commercial potential." 15 U.S.C. § 638(e)(4)(A). Although the SBIR program is generally overseen by the Small Business Administration ("SBA"), see 15 U.S.C. § 638(b), the primary implementation of the program is the responsibility of the various federal agencies that, pursuant to the statute, set aside a portion of their budgetary funds for SBIR grants. See id. § 638(f)(1).

Consistent with the SBIR enabling statute, whenever NSF sets aside funds to award SBIR grants, it will issue a solicitation that details both the categories of projects within NSF's SBIR

2

program and how NSF will receive and evaluate grant proposals. See 15 U.S.C. § 638(g). NSF solicitations identify the multiple technical characteristics that NSF will consider in evaluating whether to award a SBIR grant. NSF's SBIR solicitations identify that the agency's evaluation of a putative grant proposal focuses not just on NSF's assessment of scientific innovation in the abstract, but also on the agency's view of the commercial viability of any such scientific innovation. See 15 U.S.C. § 638(e)(4)(A). NSF's SBIR solicitations also provide extensive detail on the mechanical aspects of SBIR grant proposals.

NSF has augmented the guidance that it provides to putative grant applicants through individual solicitations by publishing a manual known as the Proposal and Award Policies and Procedures Guide ("PAPPG") that provides more detail about the grant application and review process. See NSF Proposal and Award Policies and Procedures Guide (NSF 24-1) (effective May 20, 2024), available at <<https://nsf-gov-resources.nsf.gov/files/nsf24_1.pdf>>. The PAPPG provides explanations of the various types of submissions that NSF might require in specific grant funding solicitations.

For example, "[s]ome NSF proposal types [] or funding opportunities may require submission of a concept outline prior to submission of a full proposal." PAPPG, at I-3. A "concept outline" "is a concise summary of a project idea that contains a title, the proposed proposal type, information about the prospective [primary

3

investigator], potentially germane NSF organizational unit(s), keywords, a brief narrative description of the idea, and a brief description of how the idea fits the proposed proposal type or funding opportunity." Id. Once submitted through the Program Suitability and Proposal Concept Tool ("ProSPCT"), these outlines are "considered by cognizant NSF program officers to determine the appropriateness of the work to the proposal type/funding opportunity" at issue. Id.

Additionally, "[s]ome NSF proposals require or request submission of a preliminary proposal in advance of submission of a full proposal" for review by NSF program personnel. Id. at I-4. NSF has termed the binding use of preliminary proposals as "Invite/Not Invite Decisions"; i.e., that agency officials must "Invite" a putative applicant to submit a full proposal after review and consideration of his or her preliminary proposal. Id. ("Only submitters of favorably reviewed preliminary proposals are invited and eligible to submit full proposals.").

Relevant to this action, NSF has recently employed a "preliminary proposal"-type requirement in its SBIR grant process. In February 2019, recognizing the burden on putative applicants in putting together the massive amount of information required in a full proposal, and the similar burden on agency staff in reviewing the same, NSF's Director approved the launch of "Project Pitch," a form of "Invite/No Invite" preliminary proposal process

4

applicable to SBIR grant funding. These SBIR grant funding solicitations require putative applicants to submit a concise series of statements about their proposal. See Project Pitch, available at <<https://seedfund.nsf.gov/apply/project-pitch/>>. NSF officials review these preliminary proposals for programmatic fit as defined by the associated SBIR/STTR Phase I solicitation criteria, and provide an "Invite/No Invite" decision that determines whether the applicant is eligible to submit a full proposal. See id.

Between 2020 and 2023, Plaintiff submitted multiple applications for funding to NSF's Project Pitch program and also sought funding from NSF using the ProSPCT Procedure. Each time, NSF declined to "invite" the Plaintiff to submit a full proposal for funding. These denials were binding and precluded Plaintiff from submitting a full Phase I funding proposal during designated periods. Plaintiff maintains that these denials were caused by NSF's use of "unqualified reviewers who failed to recognize the transformative nature of [his] discoveries."

Plaintiff also maintains that NSF officials refused to meet and discuss his work and the error of their denials on his Project Pitch and ProSPCT submissions. In fact, Plaintiff alleges to have traveled to NSF headquarters to attend a panel discussion open to the public and during this time "spent several hours each day over the course of three days approaching NSF officers during breaks,

pleading for an opportunity to explain the violations and obstacles that have caused harm and impeded scientific and engineering process." Although NSF officials met with plaintiff for a short time, Plaintiff contends that NSF officials did not engage further with him on the subject of his submissions despite Plaintiff's repeated e-mails and phone calls.

In February of 2024, Plaintiff filed a separate Freedom of Information Act ("FOIA") lawsuit because NSF allegedly failed to "respond to three separate FOIA requests for information related to the qualifications of reviewers for his Project Pitch submissions and the process used for their review." During the FOIA lawsuit, Plaintiff "obtained records and discovered evidence" that allegedly show NSF failed to abide by its own policies, including, but not limited to, failing to use a "merit-based, competitive process," and using "unqualified reviewers who failed to recognize the transformative nature of [his] discoveries," to evaluate Plaintiff's Project Pitch submissions. Plaintiff also alleges that the information discovered through the FOIA action "demonstrate[s] that in November 2020 NSF personnel blocked its personnel from receiving further communications (i.e., emails) from Plaintiff."

Based on this discovered information, Plaintiff now brings seven claims against NSF seeking equitable relief, including entry of an injunction or declaratory relief connected to the specific

6

nature of his claims. Plaintiff's first four causes of action seek Article III judicial review, primarily under the Administrative Procedure Act ("APA") of NSF's Project Pitch and ProSCPT procedures generally and NSF's specific decisions on whether to invite Plaintiff to submit a full proposal pursuant to a SBIR solicitation after reviewing his Project Pitch submissions and similar NSF decisions on his ProSCPT submissions. See 28 U.S.C. §§ 701, 702. Plaintiff also seeks relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, in Counts I and III.

Counts I and III maintain that NSF's Project Pitch and ProSCPT procedures are arbitrary and capricious and without observance of procedures required by applicable law because—in the case of Project Pitch—it was created without notice and comment rulemaking and—in the case of both—NSF allows the use of "unqualified reviewers," which runs afoul to the "merit-based review" process. Counts I and III also request this Court to declare NSF's Project Pitch screening process unlawful and NSF's use of unqualified reviewers to evaluate submissions under its ProSPCT tool unlawful. Plaintiff asserts that in addition to APA review pursuant to 5 U.S.C. § 706(2), he also seeks relief pursuant to § 706(1), which authorizes a district court to "compel agency action unlawfully withheld or unreasonably delayed." Plaintiff argues that § 706(1) provides authority for this Court to compel NSF to follow the requirements for a merit-based peer review method.

7

Counts II and IV make the same assertions about Project Pitch and ProSPCT, but rather than enjoining the use of those processes, ask this Court to order NSF to fund Plaintiff's grant proposals or, in the alternative, to order NSF to evaluate his grant proposals with "substantively qualified, external reviewers" consistent with the "required" merit-based review process.

Plaintiff's final three causes of action seek equitable relief based on his allegations that NSF officials, in either precluding him from continuing to send repeated e-mail correspondence or in denying his Project Pitch and ProSCPT submissions, violated his constitutional rights. Specifically, Count V alleges that NSF violated his First Amendment right to petition when it "blocked [his] emails and phone calls." Count VI alleges that NSF violated his First Amendment rights by retaliating against him for engaging in protected First Amendment activity by "block[ing] his emails and phone calls" and "denying [his] proposals." And Plaintiff's final cause of action, Count VII, alleges that NSF violated his rights under the Equal Protection Clause when it blocked his emails and phone calls and denied his proposals "because of his race and ethnicity."

On March 26, 2025, NSF filed its Motion to Dismiss Plaintiff's Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6). Plaintiff filed his opposition on April 16, 2025, and NSF filed its reply in support of its motion on May 2, 2025. Following NSF's

8

reply, Plaintiff filed a Motion to Supplement the Record on Defendant's Motion to Dismiss, a Motion for Leave to File a Sur-Reply, and a corrected version of his Motion for Leave to File Supplemental Notice. For the reasons that follow, the Court GRANTS NSF's Motion to Dismiss. The Court also DENIES Plaintiff's motions seeking an opportunity to supplement the record and file a sur-reply and will not consider the additional arguments in its decision.

Federal district courts are courts of limited subject matter jurisdiction. Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). Under Fed. R. Civ. P. 12(b)(1), a party may move to dismiss a complaint on the grounds that a court lacks subject matter jurisdiction. A motion under 12(b)(1) may argue either "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," or that "the jurisdictional allegations of the complaint were not true." Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). Plaintiff bears the burden of establishing a jurisdictional basis for their claims, and absent a showing of facts establishing this basis by a preponderance of the evidence, the case must be dismissed. Vuyyuru v. Jadhav, 555 F.3d 337, 347-48 (4th Cir. 2009). In determining jurisdiction, the district court must "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding

9

to one for summary judgment." Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768-69 (4th Cir. 1991).

A motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint. See Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). Generalized, unsupported assertions are insufficient to state a claim. See id.; Kloth v. Microsoft Corp., 444 F.3d 312, 319 (4th Cir. 2006) ("[the Court] need not accept as true unwarranted inferences, unreasonable conclusions, or arguments"). A court should dismiss a complaint if the plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A plaintiff's "obligation to provide the grounds of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (internal citation omitted). A claim will lack "facial plausibility" unless the plaintiff "plead[s] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009).

The Court will first address Counts I-IV concerning judicial review under the APA. Plaintiff seeks extraordinary relief, asking for this Court to rewrite the procedural manner through which a federal agency discharges its mission, and circumvent that

10

procedure by having his proposals approved. As an initial matter, while the APA serves as a waiver of the United States' sovereign immunity so as to authorize judicial review of agency decision-making, the APA retracts that waiver, thus precluding judicial review of agency action, that is "committed to agency discretion by law[.]" See 5 U.S.C. § 701(a)(2); see Heckler v. Chaney, 470 U.S. 821, 832 (1985) ("APA did not significantly alter the 'common law' of judicial review of agency action."); Invention Submission Corp. v. Rogan, 357 F.3d 452, 459 (4th Cir. 2004) (holding that the APA "does not provide judicial review for everything done by an administrative agency.").

The Fourth Circuit held that to determine whether an agency action was committed to agency discretion for purposes of § 701(a)(2) the court must make a two-part inquiry. Holbrook v. TVA, 48 F.4th 282 (4th Cir. 2022), cert. denied, 143 S.Ct. 2608 (2023). First, a court determines whether the subject-matter of the agency action "is the kind of agency action that 'has traditionally been committed to agency discretion.'" Id. at 290 (quoting Heckler, 470 U.S. at 832). If so, the court applies a presumption against judicial review. Id. at 293. Next, the court looks to whether Congress has overcome this presumption by providing "guidelines for the agency to follow in exercising its enforcement powers" by "circumscribing an agency's power." Id. (quoting Heckler, 470 U.S. at 833).

11

While there is "no clear rule" for making this type of determination, the Supreme Court has identified factors for consideration in determining whether agency decision-making has been committed to agency discretion: (1) "these actions involve 'complicated balancing of a number of factors which are peculiarly within [the agency's] expertise,' especially decisions that involve resource allocation and the need for flexibility to 'adapt to changing circumstances,'" id. (quoting Lincoln v. Virgil, 508 U.S. 182, 192-93 (1993)); and (2) these actions "do not exercise power over 'an individual's liberty or property interests[.]'" Id. at 291. The grant evaluation process relevant here fits well within these factors.

NSF balances complex scientific technical knowledge with the potential for commercialization and public benefit of any given proposal. Congress created NSF to house this type of expertise in a particular federal agency. See 42 U.S.C. § 1861. There is also no "liberty or property interest" that an applicant for grant funding has in their proposal, and Plaintiff does not cite to any authority that suggests otherwise. The same is true for the procedural framework that NSF has erected for consideration of grant submissions, including its decision to enact the Project Pitch program and ProSCPT program. In addition to this analysis, Plaintiff offers no authority in support of the idea that decision-making has not been committed to NSF in this case, outside of

12

appealing to the APA itself. Given this, a presumption against judicial review shall be applied.

Next, the Court looks to whether Congress has overcome this presumption. Plaintiff relies on 15 U.S.C. § 638(s) as guidelines that call for merit-based selection procedures for funds awarded through SBIR programs. § 638(s) is a single paragraph, and the statute provides no definition for "merit-based" review, leaving the Court with no standard to apply in determining whether NSF's Project Pitch and ProSPCT violate the statute. Even more convincingly, §§ 638(g)(4)(A) and (g)(5) provide that implementing agencies are to "unilaterally receive and evaluate proposals resulting from SBIR proposals" and "unilaterally select awardees for its SBIR funding agreements." Plaintiff maintains that despite this, NSF has violated the SBIR enabling statute and 42 U.S.C. 1862s (NSF's statutory charter), which both affirm a merit-based review method. However, neither defines merit-based review, and Plaintiff offers no authority as to what standard the court could apply, other than generally asserting that by lacking third-party reviewers NSF did not comply with a merit-based review process. Considering both steps of the Holbrook test, Congress did not provide any such guidelines as to circumscribe NSF's discretion and allow judicial review of their SBIR grant procedure, leaving this Court without subject matter jurisdiction on the APA claims brought by Plaintiff. To the extent Plaintiff seeks separate relief

13

pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, in Counts I and III, any relief requested under this Act also fails. See Golden & Zimmerman, LLC v. Domenech, 599 F. Supp. 2d 702, 708 (E.D. Va. 2009), aff'd on other grounds, 599 F.3d 426 (4th Cir. 2010) ("the Declaratory Judgment Act is not a waiver of sovereign immunity").

The remaining portions of Plaintiff's APA claims—that NSF implemented Project Pitch in the absence of notice and comment rulemaking and failed to follow its own rules in implementing Project Pitch and ProSPCT—also fail. Addressing the former, the APA exempts any "matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts" from the general notice and comment mandate. 5 U.S.C. § 553(a)(2). Plaintiff does not dispute that Project Pitch is a matter relating to grants, and as such it is exempted from notice and comment procedures. Moreover, Plaintiff does not mention his "notice and comment" claim within his opposition nor does he rebut NSF's argument, and therefore, concedes this point.

Plaintiff's claim that NSF failed to follow their own guidelines, or his "Accardi claim," suggests that NSF did so by failing to follow the requirement that grant proposals be considered by "external" reviewers outside of the NSF. See United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 265-68 (1954). But the entire premise of both Project Pitch and ProSCPT is to

14

allow a grant applicant to submit a streamlined pre-proposal idea for consideration by NSF officials only, who have the appropriate expertise, to determine whether it would fit the parameters of the NSF program applied to. Indeed, Project Pitch is part of NSF's rules and policies and is explicitly incorporated within SBIR solicitations. See PAPPG, at I-4 (explaining that "[s]ome NSF program solicitations require or request submission of a preliminary proposal in advance of a full proposal"). Project Pitch was also explicitly approved by the NSF's Director.

Additionally, NSF's PAPPG states that individual funding solicitations can mandate procedures that modify those articulated in the PAPPG. Regardless, PAPPG provides that "compliant proposals are [] carefully reviewed by a scientist, engineer, or educator serving as a NSF program officer, and usually by three to ten other persons outside NSF." PAPPG, at III-1 (emphasis added). Not only does this language not constitute a hard mandate for NSF to use outside reviewers, it also does not suggest that these reviewers will determine which proposals will be funded, instead leaving it to NSF's discretion. Given this, the remaining portions of Plaintiff's APA claims must be dismissed for failure to state a claim.

As for Plaintiff's constitutional claims (Counts V-VII), this Court's subject-matter jurisdiction extends only to "cases or controversies." U.S. Const. art. III. "When the issues presented

15

in a case are no longer 'live' or the parties lack a legally cognizable interest in the outcome," a "case or controversy" no longer exists, and the issue becomes moot. Powell v. McCormack, 395 U.S. 486, 496-97 (1969); Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997) (quoting United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)) ("Mootness has been described as 'the doctrine of standing set in a time frame: [t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout the litigation.'"). Moreover, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects." O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974).

At the core of much of Plaintiff's constitutional claims, which seek injunctive or declaratory relief, are his assertions that NSF "blocked" his emails and phone calls, violating his right to petition (Count V) and doing so in retaliation for exercising said right (Count VI). Defendant argues that any constitutional claim premised on the alleged blocking of Plaintiff's messages is moot because the technological measures put in place to re-route his messages are no longer in place, and therefore, this Court lacks jurisdiction over these claims.

16

In support of their argument, Defendant provided a sworn declaration from NSF's IT Security Services Branch Chief that the technological measures put in place to reroute Plaintiff's communications are "no longer in effect" and that there are no "plans on the part of NSF officials to reinstitute those measures." Indeed, the declaration clarifies that NSF never "blocked" Plaintiff's e-mails or calls, but rather, transferred the messages and calls to particular electronic and voice mailboxes where NSF officials could retrieve them if they elected to do so.

Where the purported unconstitutional conduct is not continuing in nature, a plaintiff must show a "real or immediate threat that [he] will be wronged again." Thomas v. The Salvation Army Southern Territory, 841 F.3d 632, 638 (4th Cir. 2016) (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983)); see also Lyons, 461 U.S. at 105 (holding that "standing to seek the injunction requested depended on whether [plaintiff] was likely to suffer future injury from" the putatively unconstitutional conduct).

Plaintiff, in his response, did not make any assertions pertaining to mootness but instead argued that this Court should disregard NSF's declaration because NSF is prohibited from introducing material outside the complaint that contradicts his factual allegations at the motion to dismiss stage. However, questions surrounding mootness are jurisdictional, and thus,

17

impacts the Court's subject-matter jurisdiction under Rule 12(b)(1). Iron Horse Honor Soc'y v. Heckler, 464 U.S. 67, 70 (1983) ("Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies."). The Court can review evidence, including declarations, outside the four corners of the complaint to determine its own subject matter jurisdiction to entertain a claim. See Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). Further, when a litigant challenges the factual basis on which a plaintiff seeks to vest a district court with subject matter jurisdiction, it is the plaintiff who "bears the burden of proving the truth" of any facts necessary to that jurisdiction. United States ex. rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347-48 (4th Cir. 2009). As Plaintiff has failed to demonstrate any "real or imminent threat that [he] will be wronged again" by these technological measures, or even address NSF's mootness argument, Plaintiff's claims premised upon Plaintiff's allegations concerning NSF's actions with respect to "blocking" his electronic mail messages or telephone calls are moot and thus dismissed.

Plaintiff's remaining constitutional claims, that NSF (1) violated Plaintiff's First Amendment rights by rejecting his project submissions in retaliation for Plaintiff's criticism of previous rejections (part of Count VI), and (2) violated Plaintiff's Fifth Amendment Equal Protection rights by rejecting

his submissions due to his race and ethnicity (Count VII) should also be dismissed.

First, Plaintiff concedes that he has insufficient facts to state a plausible Equal Protection claim under the Fifth Amendment. Therefore, Count VII will be dismissed. In Count VI, Plaintiff asserts that NSF officials retaliated against him for criticizing the denial of his Project Pitch submissions. In retaliation, NSF allegedly "blocked" his e-mails and messages, and "began denying Plaintiff's proposals." As previously discussed, Plaintiff's claims related to the "blocked" messages and calls is now moot. Plaintiff further failed to plead a plausible First Amendment retaliation claim with respect to NSF's denial of his subsequent proposals.

It is well-settled that boilerplate recitations of the elements of a claim are conclusory and cannot be considered in a plausibility analysis. At no point does Plaintiff provide any factual allegation concerning First Amendment retaliation other than a single conclusory assertion that NSF retaliated against him. Instead, Plaintiff's retaliation claims amount to Plaintiff's unadorned subjective feelings about why NSF made certain grant funding decisions. These types of subjective, personal conclusions do not nudge a claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 544. Moreover, as alleged, NSF officials began rejecting his Project Pitch and ProSPCT proposals

before Plaintiff began complaining to the officials. When complained-of conduct predates protected activity and continues, the inference of retaliatory conduct "does not arise." See Francis v. Booz Allen & Hamilton, Inc., 452 F.3d 299, 309 (4th Cir. 2006). And finally, Plaintiff fails to assert non-conclusory allegations that would give rise to a plausible inference that NSF denied his proposals, as it did before he engaged in protected activity, based on retaliatory animus. Therefore, Count VI will be dismissed.

For the foregoing reasons, NSF's Motion to Dismiss is GRANTED, and this case DISMISSED.

An appropriate Order shall issue.

/s/ Claude M. Hilton
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
September 2, 2025